[No. 13607.   Department Two.   February 2, 1917.]

PUGET SOUND STATE BANK, *Appellant*, v. WASHINGTON PAVING COMPANY *et al.*, *Respondents*.[1]

SET-OFF AND COUNTERCLAIM—BILLS AND NOTES — BANK DEPOSIT. Both at common law and under Rem. Code, §§ 264-266, in a bank's action upon notes given for a deposit credit, the depositor is entitled to offset the amount of the deposit and thus satisfy the debt, if it did not exceed the deposit credit.

BILLS AND NOTES—NEGOTIABILITY—MATURITY—OPTION — STATUTES —CONSTRUCTION. A note containing a provision that it shall become due and payable on demand at the option of the payee when it deems itself insecure, is not negotiable, under Rem. Code, § 3392, providing that an instrument to be negotiable must be payable on demand or at a fixed or determinable future time, which, by Id., § 3395, means at a fixed period after the occurrence of a specified event which is certain to happen though the time of happening be uncertain; that section further providing that an instrument payable upon a contingency is not negotiable.

SAME—NEGOTIABILITY—DEMAND NOTES. Such a note with a reserved power in the payee to declare it due before the stated time of maturity is not negotiable as a demand note under Rem. Code, §§ 3392 and 3444.

SAME—HOLDER IN DUE COURSE—DELIVERY WITHOUT INDORSEMENT. The transferee of a note by delivery without indorsement is not a holder in due course, in view of Rem. Code, § 3440, providing that, by such delivery, he acquires the right to an indorsement, but for the purpose of determining whether he is a holder in due course, the negotiation takes effect as of the time when the indorsement is actually made.

SET-OFF AND COUNTERCLAIM—NOTES—BANK DEPOSIT—"DEMAND"— STATUTES. A company's deposit credit in a bank, given in consideration of notes to the bank, is such an existing "demand" or cause of action as can be set off against the amount due upon the notes, after

[1]Reported in 162 Pac. 870.

transfer to one who is not a holder of the notes in due course, although no demand had been made on the bank at the time of the transfer of the notes; in view of Rem. Code, § 266, providing that a defendant in a civil action upon contract may set off a "demand" of like nature against the plaintiff which existed and belonged to him at the time of the commencement of the action, and also against an assigned note, negotiated in good faith, provided such demand existed at the time of the assignment and belonged to the defendant in good faith before notice of the assignment, and might have been offset against the person originally liable.

SAME.  Such a deposit credit at least becomes a matured demand upon the insolvency of the bank.

Appeal from a judgment of the superior court for Pierce county, Clifford, J., entered February 9, 1916, upon findings in favor of the defendants, in an action on promissory notes, tried to the court.   Affirmed.

*Hudson, Holt & Harmon* and *Walter M. Harvey*, for appellant.

*Hayden, Langhorne & Metzger*, for respondents.

PARKER, J.—The Puget Sound State Bank seeks recovery upon two promissory notes executed by the defendant Washington Paving Company, payable to its own order, thereafter transferred by it to the Olympia Bank & Trust Company by indorsements making them payable to its order, and thereafter transferred by that bank by delivery only, without indorsement, to the plaintiff.   George Milton Savage and D. I. Cornell were made defendants because they indorsed the notes at the time they were transferred by the Washington Paving Company to the Olympia Bank & Trust Company.   Trial in the superior court without a jury resulted in findings and judgment in favor of the defendants, upon the ground that, while the notes evidenced legal obligations of the defendants, they were entitled to set off against the amount due thereon to the plaintiff a greater amount which was owing to the Washington Paving Company from the Olympia Bank & Trust Company upon a deposit credit

at the time of the transfer of the notes by that bank to the plaintiff. From this disposition of the case, the plaintiff has appealed to this court.

Appellant, Puget Sound State Bank, has been, at all times here involved, a banking corporation of this state engaged in the banking business in the city of Tacoma, with H. N. Tinker as its president and manager. We shall hereafter refer to it as the Puget Sound Bank. Respondent Washington Paving Company is a corporation of this state engaged ,in street paving and other contract work, and, at the time of the execution of the notes in question, had a contract for the paving of certain streets in the city of Olympia. Respondent George Milton Savage was then, and is now, its president and manager. We shall hereafter refer to it as the paving company. The Olympia Bank & Trust Company was, at the time of the execution and transfer of the notes in question, a banking corporation of this state engaged in the banking business, in the city of Olympia, with W. D. Hayes as its cashier and manager. We shall hereafter refer to it as the Olympia Bank. It ceased to do business, because of its insolvency, on September 22, 1914.

About September 2 or 3, 1914, Mr. Hayes, cashier of the Olympia Bank, knowing that the paving company was about to enter upon the execution of a large paving contract in Olympia, solicited Mr. Savage, its president, to open an account and do its banking business with the Olympia Bank. The conversations occurring between Mr. Hayes and Mr. Savage at that time, and a few days later when the notes were executed, constitute an agreement with reference to which the trial court found as follows:

"At the time of the discount of said notes by the Olympia Bank & Trust Company, it was agreed between said bank and the Washington Paving Company that the same should be held by the Olympia Bank & Trust Company and not sold, hypothecated or otherwise disposed of to any other bank or banker without first notifying the Washington Paving Company and giving the Washington Paving Company an op-

portunity to pay said notes, or the one of them proposed to be sold, hypothecated or otherwise disposed of."

This finding, we think, is amply supported by the evidence. Indeed, it seems not to be seriously disputed by Hayes or any other witness. In pursuance of this agreement, on September 5, 1914, at the Olympia Bank, four notes for $5,000 each, payable ninety days after date, with seven per cent interest, after maturity, were executed by respondent paving company by Savage, its president, the notes being made payable to its own order and immediately transferred to the Olympia Bank by indorsement making them payable "to the order of Olympia Bank & Trust Co." Thereupon the paving company was given credit as a general depositor of the Olympia Bank for the sum of $20,000, less the amount of discount charged by the bank. This was the only deposit ever made by the paving company with the Olympia Bank. We have, then, as this single transaction, united in all its parts, the execution of the notes; their transfer to, and discount by, the Olympia Bank; the agreement on the part of that bank not to transfer them; and the deposit credit given to the paving company for the proceeds of the notes less the discount charge. Each of these notes contains, among other provisions, the following: "This note shall become due and payable on demand at the option of the payee, when it deems itself insecure." Up to and including September 22, 1914, the paving company had drawn checks upon its deposit credit in the Olympia Bank reducing that credit to approximately $9,650. One of these checks, constituting nearly the whole of such reduction, was given to the Olympia Bank for the surrender of two of the notes on that day. This balance has never been further reduced, and is now claimed by the paving company as an off set against, and as greater in amount than, the balance due the Puget Sound Bank upon the notes.

On Saturday, September 19, 1914, the Olympia Bank became indebted by overdraft to its Tacoma correspondent, the Puget Sound Bank, in the sum of approximately $3,600.

Thereafter on that day, in a telephone communication, Mr. Hayes of the Olympia Bank promised Mr. Tinker of the Puget Sound Bank that this overdraft would be cared for "either with exchange or in a manner satisfactory to" the Puget Sound Bank.  But in no communication between the banks or their officers on that day was reference made to the notes of the paving company, all of which were still held by the Olympia Bank.  On Monday, September 21, at about eight o'clock in the morning, Mr. Tinker again called Mr. Hayes by telephone, informing him that nothing had yet come to the Puget Sound Bank from the Olympia Bank to take care of this overdraft.  It was then agreed that the Puget Sound Bank would purchase one of the paving company's notes from the Olympia Bank.  Mr. Hayes accordingly then sent by mail to the Puget Sound Bank not only the note agreed to be purchased, but also the three other notes.  None of these notes were ever indorsed by the Olympia Bank, so that they were acquired by the Puget Sound Bank by delivery only.  About noon on that day, the Puget Sound Bank received from the Olympia Bank a telegram requesting that $2,000 in gold be sent to it.  The paving company's notes had not yet arrived at the Puget Sound Bank and Mr. Tinker called Mr. Hayes by telephone and so informed him, and reminded him that the $5,000 note agreed to be purchased would not cover the then existing overdraft and $2,000 additional.  Mr. Hayes then informed Mr. Tinker that he had sent not only the note which was agreed to be purchased by the Puget Sound Bank, but also the other three notes of the paving company, requesting that they be retained until the Puget Sound Bank should otherwise be reimbursed.  Soon thereafter, early in the afternoon, the four notes were received by the Puget Sound Bank through the mail.  When the notes were received, Mr. Tinker called Mr. Savage of the paving company by telephone, when a conversation was had between them, concerning which Mr. Savage testified as follows:

"I was called to the telephone and the man at the other end said he was Mr. Tinker of the Puget Sound State Bank, and wanted to know if we had executed some notes and deposited with the Olympia Bank & Trust Company; I told him we had, that we had executed four $5,000 notes. He said, 'Have you received the money?' I said, 'Not exactly; we have received credit in the bank, and checked out less than $200.' That was all the conversation we had in regard to the notes."

There is some conflict between the testimony of Mr. Savage and Mr. Tinker as to the purport of that conversation; but we feel constrained to believe that Mr. Savage did not then make any statement that would lead Mr. Tinker to believe that the paving company had no defense or off set against the notes as against the Olympia Bank, nor any statement which Mr. Tinker could rightly construe as a consent of the paving company that the Puget Sound Bank might acquire the notes. Two of the notes were sent back to the Olympia Bank that afternoon, one being retained as purchased by the Puget Sound Bank, and the other retained by it to secure the overdraft which would be caused by sending the $2,000. Thereafter, late that afternoon or early the next morning, the Puget Sound Bank shipped to the Olympia Bank $2,000 in gold as requested. So that, as claimed by the Puget Sound Bank, there then became owing to it the whole of the note which it claimed to have so purchased and approximately $700 upon the overdraft secured by the other note. About ten o'clock the next morning, Tuesday, the 22d, Mr. Savage went to the Puget Sound Bank and asked Mr. Tinker if it then had the notes, when he was informed that it had two of them, having returned the other two to the Olympia Bank. Mr. Savage then protested to Mr. Tinker against the Puget Sound Bank thus acquiring the notes, informing him that payment of them would be resisted as if they were held by the Olympia Bank. He then went to Olympia, where he had a somewhat strenuous session with Mr. Hayes relative to the Olympia Bank transferring the notes to the Puget Sound Bank, the details of which are not material here, and at that

time took up the two notes which had been returned to the Olympia Bank, by giving the paving company's check against its deposit credit in that bank, which resulted in that deposit credit being reduced to approximately $9,650, which, it will be seen, is more than sufficient to satisfy the claim of the Puget Sound Bank if allowed as a set-off.

There is considerable testimony in the record relative to the insolvency of the Olympia Bank and as to when it actually became insolvent. This testimony came into the record in an effort on the part of counsel for respondent to show that the Olympia Bank was insolvent at the time it transferred the notes to the Puget Sound Bank, and to bring home to the Puget Sound Bank knowledge of such insolvency at that time. There is much in this evidence that suggests actual insolvency at that time and the Puget Sound Bank's knowledge thereof, or at least knowledge of such facts as to put it upon inquiry touching such insolvency. It is sufficient, however, for our present purpose to know that the Olympia Bank was insolvent upon the closing of business on September 22d, and that it closed its doors and went into the hands of the state bank examiner on the morning of September 23d without opening for business on that day. The two notes in question matured December 5, 1914, and thereafter appellant, Puget Sound Bank, commenced this action for recovery thereon.

It hardly needs argument or citation of authorities to demonstrate that, if the Olympia Bank, instead of the Puget Sound Bank, was still the holder of and seeking recovery upon these notes, respondent paving company could offset against the debt evidenced thereby the amount due to it upon its deposit credit in the Olympia Bank, and thus satisfy such debt if it did not exceed the amount of such deposit credit. Our statute relating to counterclaim and set-off, and the most elementary principles of law, at once renders this apparent, since the paving company's debt, evidenced by the balance due upon the notes, and the Olympia Bank's debt, evidenced by the deposit credit, would be mutual as between

the Olympia Bank and the paving company.   Our problem
then is, Is the Puget Sound Bank wholly in the shoes of the
Olympia Bank?   If this question be answered in the affirma-
tive, manifestly the Puget Sound Bank cannot recover in this
action, because the amount due it upon these notes is less than
the amount of the deposit credit of the paving company in the
Olympia Bank.   Rem. Code, §§ 264, 265, 266.

Are the notes negotiable in the sense that their transfer to
the Puget Sound Bank destroyed the defense of set-off in-
voked by the paving company?   We have seen that each of
the notes contains this provision:  "This note shall become
due and payable on demand at the option of the payee when
it deems itself insecure."   In our negotiable instruments act
we read:

"An instrument to be negotiable must conform to the fol-
lowing requirements:  . . .  3. Must be payable on de-
mand, or at a fixed or determinable future time;"   Rem.
Code, § 3392.

"An instrument is payable at a determinable future time,
within the meaning of this act, which is expressed to be
payable—'  . . .  3. On or at a fixed period after the
occurrence of a specified event, which is certain to happen,
though the time of happening be uncertain.

"An instrument payable upon a contingency is not nego-
tiable, and the happening of the event does not cure the de-
fect."   Rem. Code, § 3395.

These provisions, we think, answer this question according
to the contention of counsel for respondents.   We think the
word "contingency," as here used, refers to contingency as
to time, though it may also refer to other contingencies.   Let
us, however, look to the law as found in the decisions of the
courts, of which, after all, these statutory provisions are only
declaratory.   We note here that the above quoted provision
in these notes gives the Olympia Bank, the payee, the unre-
stricted power to declare the notes due at any time before
maturity, and that the right to exercise such power possessed
by the payee is not dependent upon, nor does it grow out of,

any act, promise or agreement of the paving company, the maker of the notes. In other words, it is a contingency over which the maker of the notes has no control.

In *Brooks v. Hargreaves*, 21 Mich. 254, there was under consideration the question of the negotiability of a note which, while providing for payment one year after date, contained also the following:

"To be paid when any dividends shall be declared on such shares as Joseph Smith has been holding heretofore in the Agricultural and Broom Handle Manufacturing Company."

Chief Justice Campbell, speaking for the court, while recognizing that the note would, in any event, become payable at the end of the year, held that the contingency specified in the above quoted portion of the note was so uncertain as to time of payment as to render the note nonnegotiable, and observed:

"As the note on either hypothesis might have become payable at a time which could not be made certain by any attainable means, it cannot be regarded as a promissory note. That must be payable at a time which must certainly arrive in the future, upon the happening of some event or the completion of some period not depending on the future volition of any one. The maturity of this instrument was liable to be hastened or postponed by the action of the corporation."

In *First Nat. Bank v. Bynum*, 84 N. C. 24, 37 Am. Rep. 604, the court had under consideration a note containing this provision:

"The express condition of the sale and purchase of the engine separator for which this note is given, is such, that the title, ownership or possession does not pass from the said Taylor Manufacturing Company of Westminster, and said company have full power to declare this note due and take possession of said engine separator at any time they may deem this note insecure, even before the maturity of the same."

Justice Ashe, speaking for the court and holding that this was a nonnegotiable note, said:

"But there is another serious objection to the claim set up for the negotiability of this instrument. It stipulates that the payees shall have full power to declare the note due at any time they may deem the note insecure, even before the maturity of the same. This divests it of the quality of certainty in the time of payment, which as has been shown is one of the essential elements of negotiability. The time of payment may be hastened at the option of the payees, and is therefore uncertain. And it has been held in Michigan that it is essential to a promissory note that it be payable at a time that must·certainly arrive in the future, upon the happening of some event, or the completion of some period, not depending upon the volition of any one. *Brooks v. Hargreaves*, 21 Mich. 254."

In *Carroll County Sav. Bank v. Strother*, 28 S. C. 504, 518, 6 S. E. 313, there was under consideration a similar note given as the purchase price of an engine and sawmill, the title of which was to remain in the seller until payment of the note. The note contained a provision that the payee has "full power of declaring this note due, and take possession of said engine and sawmill, at any time they may deem this note insecure, even before the maturity of the same." Holding that this right of the payee to declare the note due at any time rendered it nonnegotiable, Justice McIver, speaking for the court, said:

"As to the other stipulation whereby the payee is invested with authority to declare the so-called note due whenever it is deemed insecure, it seems to us clear that it is sufficient, not only to deprive the paper of its negotiability, but also of its character as a note; for it renders the time of payment altogether uncertain, and dependent only upon the option of the payee."

In *Reynolds v. Vint*, 73 Ore. 528, 144 Pac. 526, a similar note was held nonnegotiable, wherein Chief Justice McBride, speaking for the court, said:

"A note providing, as the note in suit does, that whenever Reynolds or his agents deem the note insecure they shall

have power to declare it due, even before maturity, is non-negotiable."

In *Holliday State Bank v. Hoffman*, 85 Kan. 71, 116 Pac. 239, Ann. Cas. 1912D 1, 35 L. R. A. (N. S.) 390, there was involved a note accompanied by collateral security specified therein, and containing the following:

"If, in the judgment of the holder of this note, said collateral depreciates in value, the undersigned agrees to deliver when demanded additional security to the satisfaction of said holder; otherwise, this note shall mature at once."

While recognizing that the note was nonnegotiable because of the promise to furnish additional security to the satisfaction of the payee, it was also held nonnegotiable because of the right of the holder to cause the note to mature at any time, Justice Porter, speaking for the court, observing:

"The note is nonnegotiable for the further reason that the same provision renders doubtful and uncertain the time at which it shall become due. If the maker shall fail when demanded to furnish additional security to the satisfaction of the holder, the note shall mature at once. It is argued that this is no different in principle from the provision that default in the payment of any installment shall accelerate the maturity of the note, and cases are cited in which we have held that a similar provision will not render the note nonnegotiable. (See *Clark v. Skeen*, 61 Kan. 526.) The negotiable instruments law itself expressly declares that a negotiable instrument may contain provisions of this kind. (Gen. Stat. 1909, §§ 5255, 5257.) The distinction between such a stipulation and the one in question lies in the fact that in the one instance the maturity is accelerated by the default of the maker alone and the default is to consist in his failure to pay money. Here the maturity of the note is to be accelerated by the failure of the maker to do something in addition to the payment of money, and both contingencies are made to depend upon something over which he has not the absolute control. It is within the power of the holder by refusing to assent to what the maker has done arbitrarily to make the note due at any time between the date of its execution and six months thereafter. If the holder is not

satisfied with the additional security the note matures at once, and thus the time at which it may mature would depend upon the time at which the holder declared himself dissatisfied with the security delivered by the maker. The effect of this stipulation is to leave the time when payable uncertain and indefinite."

In *Kimpton v. Studebaker Bros. Co.*, 14 Idaho 552, 94 Pac. 1039, 125 Am. St. 185, the note involved contained a similar provision giving the payee the uncontrollable option to declare it due before its stated date of maturity; and while it contained other provisions which may be considered as rendering it nonnegotiable, it was held that this option of the payee rendered it nonnegotiable.

It is true that the decisions above noticed, other than the Michigan case, relate to notes accompanied by some claim to or lien upon specified property as security, but it seems clear that in all of them the right of the payee of the note to declare the same due before maturity upon his deeming himself insecure was the controlling fact rendering the notes nonnegotiable. In other words, the question of the time of payment of the note, in each of those cases, was dependent absolutely upon the will and election of the payee of the note. That is, it was "dependent on the future volition of" one other than the maker of the note, paraphrasing the language of Chief Justice Campbell, above quoted from *Brooks v. Hargreaves*. Such is the option of the Olympia bank as to these notes. In *Bright v. Offield*, 81 Wash. 442, 450, 143 Pac. 159, we recognized this as being the correct doctrine, though the exact point was not there involved.

It might be contended that these notes, by reason of the power of election on the part of the payee as to their maturity, became in effect demand notes and were, therefore, negotiable under Rem. Code, § 3392, above quoted, and that, being transferred to appellant, Puget Sound Bank, within a reasonable time after their execution, they would be freed

from equitable defenses of the maker, as apparently is contemplated as to demand notes by Rem. Code, § 3444. We think, however, the authorities above noticed answer any such contention and render it clear that the making of the notes payable at a certain time, with the reserved power to the payee to declare them due before the stated time of maturity if he deems himself insecure, does not make them demand notes within the meaning of §§ 3392 and 3444. We feel constrained to hold that these notes are not negotiable and are, therefore, subject to any defense the paving company may have against them which existed at the time of their transfer to the Puget Sound Bank.

Aside from the question of the negotiability of the notes in form, did not their transfer to the Puget Sound Bank by the Olympia Bank, without indorsement and by delivery only, render them subject to defenses the paving company might have against them in the hands of the Olympia Bank? This question seems to be answered in the affirmative by Rem. Code, § 3440, as follows:

"Where the holder of an instrument payable to his order transfers it for value without indorsing it, the transfer vests in the transferee such title as the transferrer had therein, and the transferee acquires, in addition, the right to have the indorsement of the transferrer. But for the purpose of determining whether the transferee is a holder in due course, the negotiation takes effect as of the time when the indorsement is actually made."

This is but a statutory declaration of the general rule. 8 C. J. 388; *Trust Co. v. National Bank*, 101 U. S. 68. Plainly the Puget Sound Bank never acquired the notes "in due course," so far as the rights of the paving company are concerned, nor is the Puget Sound Bank aided in this particular by the fact that the notes were transferred to the Olympia Bank by indorsement of the paving company instead of by being made payable directly to the Olympia Bank, since that indorsement made them payable "to the order of the Olympia

Bank & Trust Co.", and they are upon their face made payable "to the order of Washington Paving Co." So they never became payable to bearer so as to be capable of passing their title by delivery only and freeing them from equitable defenses in the hands of the Puget Sound Bank.

Was respondent paving company's deposit credit in the Olympia Bank such an existing demand or cause of action, at the time of the transfer of the notes by the Olympia Bank to the Puget Sound Bank, as can be set off against the amount due upon them in the hands of the Puget Sound Bank? That such deposit credit was then an existing demand in favor of the paving company against the Olympia Bank in the sense that it was then at least an existing unmatured debt of the Olympia Bank to the paving company, is plain. Counsel for the Puget Sound Bank insist that, since at that time no demand had been made by the paving company of the Olympia Bank for the payment of such debt, it was not then a matured cause of action and, for that reason, incapable of being set off against the amount due upon the notes in the hands of the Puget Sound Bank. In other words, that whatever the right of set-off might be in favor of the paving company as against the Olympia Bank, no set-off can be invoked as against the Puget Sound Bank except such as constituted a perfect and matured cause of action in favor of the paving company and against the Olympia Bank at the time of the transfer of the notes to the Puget Sound Bank; even though the notes are not negotiable and were transferred without indorsement and by delivery only. Counsel invoke the general rule that a general deposit credit does not become a matured cause of action in favor of the depositor until demand therefor by the depositor, from which it is argued that, for want of such demand by the paving company before the transfer of the notes to the Puget Sound Bank, the paving company had no cause of action against the Olympia Bank which was then or thereafter available as an offset as against the Puget

Sound Bank. This contention we think is answered adversely to appellant by Rem. Code, § 266, reading as follows:

"The defendant in a civil action upon a contract expressed or implied, may set off any *demand* of a like nature against the plaintiff in interest, *which existed and belonged to him at the time of the commencement of the suit.* And in all such actions, other than upon a negotiable promissory note or bill of exchange, negotiated in good faith and without notice before due, which has been assigned to the plaintiff, he may also set off a demand of a like nature existing against the person to whom he was originally liable, or any assignee prior to the plaintiff, of such contract, *provided such demand existed at the time of the assignment thereof, and belonging to the defendant in good faith, before notice of such assignment, and was such a demand as might have been set off against such person to whom he was originally liable. . . .*"

We have italicized the words of this section particularly to be noticed, and specially to call attention to the fact that the word "demand" and not "cause of action" is used as descriptive of the claim which may be available to a defendant as a set-off. It seems plain to us that the deposit credit was a "demand" within the meaning of this section, existing and belonging to the paving company at the time of the transfer of the notes to the Puget Sound Bank, though possibly it was not then a matured cause of action for want of demand for its payment. Of course, it existed before the paving company had notice of the transfer of the notes to the Puget Sound Bank, because it existed before that transfer. It is equally plain that it is a demand which could have been set off against the Olympia Bank had it been seeking recovery upon the notes, as we think the mere demanding of it to be so set off would have made it a matured cause of action as against the Olympia Bank, though a mere claim of set-off in this case would not of itself make it a matured cause of action as against the rights of the Puget Sound Bank. It might well be argued that, when the Olympia

Bank breached its agreement with the paving company by the transfer of the notes to the Puget Sound Bank, that fact, in any event, matured the paving company's deposit credit in that bank as a cause of action without demand, so as to render such deposit credit immediately available to the paving company as an offset to the notes, as against any holder thereof, they being nonnegotiable and transferred by delivery only. But however that may be, that deposit credit, in any event, became a matured demand and cause of action upon the insolvency and closing of the doors of the Olympia Bank, which occurred long before the commencement of this action. 3 R. C. L. 568; 7 C. J. 664. It seems plain to us, therefore, that, since the paving company's deposit credit in the Olympia Bank was a "demand" within the meaning of § 266, above quoted, existing in favor of the paving company at the time of the transfer of the notes to the Puget Sound Bank, and at least became a matured cause of action before the commencement of this action, and it being a demand greater than the total amount due upon the note purchased by the Puget Sound Bank and the amount secured to it by the transfer of the second note, such demand became available to the paving company as a complete defense by way of set-off against the claims of the Puget Sound Bank upon the notes.

The California court in *St. Louis Nat. Bank v. Gay*, 101 Cal. 286, 35 Pac. 876, has held in harmony with the conclusion we here reach, under a statute which refers to the claim which may be set up in defense as a *"cause of action."* At page 290, Justice McFarland, speaking for the court, said:

"By section 438 of the Code of Civil Procedure in an action on contract the defendant may set up any cause of action arising upon contract, and 'existing *at the commencement of the action.*' If Dare had kept his note and sued on it in August, 1892, respondent could unquestionably have set off the Collins note; and it seems a clear proposition of law, under the sections of our code above stated, that in an

action by the assignee of a chose in action not negotiable, the defendant may successfully plead any set-off which he could have so pleaded against the assignor if he had retained and brought suit on it, provided he acquired it before notice of assignment, and provided further that it was 'existing at the commencement of the action.' It is contended that at the time of the notice of assignment the Collins note was not an 'existing' setoff because it was not then quite due, and therefore not presently suable. But the thing itself—the note, the chose in action—was then existing; and it was pleadable by counterclaim when this action was commenced."

We conclude that the judgment must be affirmed. It is so ordered.

MORRIS, HOLCOMB, MOUNT, and FULLERTON, JJ., concur.