[No. 23442. Department Two. May 9, 1932.]

CHARLES J. KOPPLER *et al., Respondents,* v. THROND P. BUGGE *et al., Appellants.*[1]

[1]Reported in 11 P. (2d) 236.

*Eli M. Paulson* and *Howard A. Adams,* for appellants Bugge *et al.*

*Roberts, Skeel & Holman* and *Tyre H. Hollander (F. C. Hackman,* of counsel), for appellant Penn Mutual Life Insurance Co.

*Poe, Falknor, Falknor & Emory,* for respondent Koppler.

*Lloyd R. Savage,* for respondent Theisen.

*Meyers & Couden,* for respondent Schwede.

*Bausman, Oldham, Walkinshaw & Jarvis,* for respondent Van Valkenburgh.

*Miller & Weiss,* for respondents Bune *et al.*

*Joseph Matsen,* for respondents Beckman *et al.*

*Edwin H. Flick* and *Herald A. O'Neill,* for respondents Kasberger *et al.*

HOLCOMB, J.—The consideration of this case has been delayed somewhat out of its proper order on account

of the magnitude of the record and briefs and its importance to the parties.

This action was brought by respondent Koppler and eleven others to reestablish, as a valid and subsisting lien, a certain mortgage given by appellants Bugge to Osner & Mehlhorn, Inc., as mortgagee, alleged to have been wrongfully satisfied by August Mehlhorn, Jr., an officer of the mortgagee corporation, and to have the mortgage established as a lien prior to a later mortgage executed in favor of Calvin Philips & Company, a corporation, and assigned to The Penn Mutual Life Insurance Company, a corporation, subsequent to the satisfaction of the Osner & Mehlhorn mortgage.

Appellants Bugge and wife pled payment. Appellant The Penn Mutual Life Insurance Company, which will hereinafter be mentioned as Penn Mutual, pleaded affirmatively, first, payment and satisfaction by Bugge; second, purchase by it of the Calvin Philips mortgage in good faith and without notice; third, estoppel as to respondents; and fourth, agency between Osner & Mehlhorn, Inc., and respondents, and that payment to Osner & Mehlhorn, Inc., was payment to the note owners.

The case, being one in equity, was tried before the court, without a jury, who made no findings, but filed a memorandum opinion which is here set out:

"The court reaches the following conclusions respecting the principal issues presented on the trial:

"(1) The twenty serial Bugge notes of February 9, 1926, secured by the Osner & Mehlhorn mortgage are negotiable notes, the plaintiffs are bona fide purchasers for value in due course, and, as such, are pro tanto owners and holders of the mortgage which secured them.

"(2) Payment to Osner & Mehlhorn was not payment to plaintiffs. Where one advances money to an alleged agent of the holder to satisfy a mortgage and

the notes which such mortgage secures, it is his duty at his peril to see that the person whom he pays as agent is either (a) in possession of the instruments, or (b) has special authority to receive payment, or (c) has been represented by the owner and holder of the securities to have such authority.

"No evidence was introduced tending to establish (a) or (c). As to (b), the course of dealing on the part of the respective plaintiffs with Osner & Mehlhorn as shown by the evidence was insufficient to constitute that company the agent of the plaintiffs to collect the principal of the notes here involved without the possession of the instruments themselves.

"(3) Calvin Phillips & Company had notice of facts sufficient to put it on inquiry as to outstanding obligations and as to whether they were held by third parties.

"The recital on Plaintiff's Exhibit A, 'Delivery of all notes guaranteed,' taken in connection with the admissions of Mr. Stutfield, the assistant secretary of the company, the knowledge which the company had of the nature of the Osner & Mehlhorn business, the trade custom in this class of transaction among mortgage concerns in this community, and the reference in the prior mortgage to the existence of serial notes should have sufficed to put any lender of money on inquiry as to where the notes were and as to who were the owners and holders of them. This is all the actual notice required. Where it exists, the one paying over money to have a prior mortgage released is responsible for seeing that it reaches the actual owners and holders of the notes.

"(4) Calvin Phillips & Company was the agent of Mr. Bugge for the purpose of seeing that the Osner & Mehlhorn mortgage and notes were satisfied, and the failure of his agent to pick up the notes is attributable to him. Mr. Bugge, therefore, is liable to the holders of the notes.

"(5) The transactions between Penn Mutual Life Insurance Co. and Calvin Phillips & Company were such as to constitute notice to Penn Mutual that there were or might be outstanding obligations superior to Penn Mutual's mortgage.

"While the two companies at all times were meticulous in keeping the *form* of their relationship that of vendor and vendee, the circumstances show that in *substance* there was at least a limited agency on the part of Calvin Phillips & Company to represent Penn Mutual in certain particulars in connection with the release of outstanding obligations and in the recording of assignments.

"The letter of February 28, 1928 (Plaintiff's Exhibit I) from Penn Mutual's manager of mortgage loans to Calvin Phillips wherein it is stated 'that it has been made a requirement that we hold with each loan purchased a receipt signed by the borrower acknowledging the receipt of the funds' is only one of a number of circumstances tending to show that Penn Mutual's position in this case is not strictly that of a mere vendee.

"The fact that Calvin Phillips & Company was the authorized agent of Penn Mutual to record the assignment is apparent. This they did on June 22, 1928. After they executed and recorded the assignment, Calvin Phillips & Company necessarily had continuing authority for certain purposes. In the opinion of the court, the agency which they exercised on June 22 was sufficiently broad to charge Penn Mutual with what Calvin Phillips & Company learned eleven days later on July 3 and to charge it with notice of the 'delivery of all notes guaranteed' provision of the receipt which Mr. Stutfield accepted on that day, all of which was prior to the time that Penn Mutual parted with its $25,000.

"The fact that on June 22, when Calvin Phillips & Company recorded the assignment, the Osner & Mehlhorn mortgage with its reference to the serial notes was still on record unsatisfied, the long established usage among the large loaning companies in connection with re-financing deals to take receipts guaranteeing that the old notes would be surrendered,—a custom which must be deemed to have been known to Penn Mutual after dealing in mortgages here for more than twenty-five years—are additional circumstances which lead to the conclusion that Penn Mutual had both constructive

and actual notice sufficient to bring home to it the fact that the notes were outstanding and to prevent its claiming the privileges of a bona fide purchaser of real estate without notice.

"Having sufficient notice, the defendants had it within their power to prevent any loss to plaintiffs by merely insisting upon the surrender of the notes. They ignored the notice and paid at their peril in apparent reliance upon the guarantee of Osner & Mehlhorn. Their negligence in this regard brought about the loss, and this loss must fall upon them rather than on the plaintiffs.

"Two other interesting contentions were submitted by counsel for plaintiffs: (1) That the Penn Mutual is a mere assignee and not a holder in due course of the note transferred to it by Calvin Phillips; (2) That the payment to Osner & Mehlhorn was a partial payment rather than a payment in full according to the terms of the note, and therefore outside the scope of its authority even though it was authorized to collect principal. In view of the court's previously announced conclusions, however, it becomes unnecessary to decide these questions.

"A decree may be prepared and submitted in accordance with this opinion."

Since August Mehlhorn, Jr., secretary and manager of Osner & Mehlhorn, Inc., was the active participant in all matters relating to this controversy, that concern will hereafter be spoken of as Mehlhorn, for the sake of brevity, and Calvin Philips & Company will be mentioned as Philips & Co.

The mortgage which had been given by appellants Bugge to Mehlhorn contained the following clause:

"This Conveyance is intended as a Mortgage to secure the payment of the sum of Twenty-five Thousand and no/100 Dollars, together with interest thereon at the rate of seven (7) per cent. per annum from date until paid, according to the terms and conditions of twenty certain promissory notes, bearing even date herewith made by the said parties of the first part,

payable as stipulated in said notes to the order of said Osner & Mehlhorn, Inc., and these presents shall be void if such payment be made according to the terms and conditions thereof.''

The notes secured by that mortgage, with the exception of the amounts, were all identical, and recited that it was one of a series of twenty notes, numbered from one to twenty, inclusive, aggregating the sum of $25,000, secured by a mortgage executed by appellants Bugge to Mehlhorn upon certain described real estate in Seattle, King county, Washington, and also contained the following clause:

''Upon default in the payment of principal or interest on this note then at the option of the holder hereof the whole amount of principal, accrued interest and charges secured by said mortgage shall, without notice, become immediately due and payable and the said Osner & Mehlhorn, Inc., shall proceed immediately to recover the sum thereof and to foreclose the said mortgage.''

Appellant Bugge had, for about twenty years, been engaged in the loan and real estate business in Seattle. Mehlhorn had for many years been engaged in loaning money upon real estate security in the investment of money for its clients and the purchase and sale of mortgage securities. It sold $20,000 of the notes above described to the several respondents, and $5,000 to one Bloxom. The mortgage was never assigned, in whole or in part, to any of the note purchasers, but was permitted by all to remain of record in the name of the Mehlhorn firm, the mortgagee. It was a similar transaction to many others of the Mehlhorn firm where it took a mortgage to secure an indebtedness, and had a series of notes evidencing the indebtedness which it would sell to its customers, retaining the mortgage security in its own name and satisfying the mortgage when paid.

No notice was ever given to Bugge, either by the mortgagee or the note holders, that any of these notes had been sold by Mehlhorn, and Bugge never knew until long after the payment of the mortgage that Mehlhorn did not continue to be the owner of all the notes. He paid interest to Mehlhorn until the principal was paid in full on July 3, 1928, and the mortgage satisfied of record by the mortgagee. Bugge usually paid in a lump sum to Mehlhorn, and not upon any particular note, or notes. None of respondents ever demanded interest or principal payments from Bugge personally.

On September 13, 1926, appellants Bugge executed a second mortgage to the Mehlhorn firm, as mortgagee, upon the same property to secure the payment of an indebtedness of two thousand dollars, evidenced by six promissory notes, five in the sum of two hundred dollars each and the last in the sum of one thousand dollars. No claim was ever made by any note holders under this mortgage, and it is not here involved, but it is mentioned to show the condition of the title at the time the Philips mortgage was given.

Philips & Co. is a mortgage loaning concern of long standing and reputation in Seattle, of which Calvin Philips has for many years been president and manager. It loaned money on mortgaged security, and bought and sold mortgage securities. For many years it sold a large number of its mortgage loans to Penn Mutual, but also had twenty-five or thirty, or possibly fifty, other clients or patrons, to whom it sold Seattle mortgage loans.

In February, 1928, Bugge, desiring to take advantage of an interest rate of five and one-half per cent offered by Philips & Co., and for the purpose of raising sufficient money to pay off the first mortgage to Mehlhorn, applied to Philips & Co. for a first mortgage loan

in the sum of twenty-five thousand dollars on the same property. Bugge made written application to Philips & Co. for such loan, and in the application agreed to pay a stated commission and all expenses of the loan.

Philips & Co. had, for twenty-five or thirty years, used an application form for mortgage loans on Seattle real estate in about the same form, which it presented to all its clients or patrons who bought Seattle real estate mortgages, and which had been approved by Penn Mutual. Philips & Co. expected to sell the Bugge mortgage, when consummated, to Penn Mutual if the title was satisfactory, and Penn Mutual had sufficient funds for that amount to loan in Seattle.

The application for the loan was signed on February 15, 1928, addressed to Philips & Co. On February 20, Calvin Philips, president of this company, who was then in his Oakland office, wrote and personally delivered the Bugge application to R. G. Holt, the salaried district inspector of Penn Mutual, whose headquarters were in Denver, who was then in Oakland. With the letter accompanying the application, he also enclosed the inspection report and photographic survey which had been made by Philips & Co. in Seattle, and other information concerning an overlap of the building upon the street of about a foot, which was expected to be settled with the city by obtaining a vacation, or a permit to allow that portion of the building to remain on the street. He requested the inspector to have the application acted upon and advise the Seattle office of Philips & Co. by wire of the decision reached.

On February 21, 1928, Holt acknowledged receipt of the Philips letter and the application, and stated that he was forwarding the same to the home office of Penn Mutual with his recommendation that the Bugge application for a loan of twenty-five thousand dollars be accepted, conditioned upon the city vacating the one-

foot strip on the street which the building overlapped, or having the city council, by some measure, permit the building to remain on that portion of the street, and had asked the home office that Philips be advised by telegraph of the decision reached.

On February 28, the manager of mortgage loans of Penn Mutual, in Philadelphia, wired Philips & Co. that:

"Subject all things being found satisfactory settlement our convenience committee approves following applications Bugge twenty-five thousand maturing six hundred twenty-five semiannually beginning one year balance ten years overlap objection to be satisfactorily removed." (Continuing, the message approved another application.)

On the same date, the manager of mortgage loans for Penn Mutual wrote to Philips & Co. a letter confirming the telegram, with more details as to the interest being five and one-half per cent, and other things, and therein stated:

"We would call attention to the fact that it has been made a requirement that we hold with each loan purchased a receipt signed by the borrower acknowledging receipt of the funds. If such a receipt has been taken we shall appreciate it if you will include it when forwarding the papers. If, however, it has not been your past practice to take such a receipt, kindly arrange to do so in connection with all loans which you expect to ultimately sell to our company."

A clause in the letter then referred to the encroachment of the building upon the street, and that it was necessary that that objection be satisfactorily removed. It was then said:

"Under our rules it is necessary for us to say that if this case is not ready for consummation within sixty days from this date we reserve the right to charge interest after that time or at our option dismiss the loan from our pending list."

In the written application made to Philips & Co., Bugge directed that firm to pay the twenty-five thousand dollar mortgage indebtedness to Mehlhorn when the new loan was closed. It was thus shown that the new loan was for the purpose of refinancing an old one. A preliminary title search showed the existence of the mortgages of February 9 and September 13, 1926. The matter of the encroachment of the building on the street having been adjusted, Bugge and wife, on June 11, 1928, executed their mortgage to Philips & Co., mortgagee, upon the property described in the complaint herein, to secure the payment of $25,000, evidenced by a promissory note of even date. The mortgage was recorded June 22, 1928, prior to the closing of the loan.

On July 3, 1928, an agent from the office of Philips & Co. delivered to Mehlhorn, personally, the certified check of Philips & Co. for twenty-five thousand dollars, payable to the Mehlhorn concern, which paid in full the principal of the Bugge notes and mortgage, dated February 9, 1926. Mehlhorn thereupon delivered to the agent of Philips & Co. a written satisfaction of the mortgage, and also of the second mortgage of September 13. Mehlhorn also delivered to this agent the fire insurance policies on the Bugge property. Mehlhorn also caused his cashier and assistant to deliver to the agent of Philips & Co. a receipt for the twenty-five thousand dollars, with the notation thereon: ''Delivery of all notes guaranteed.''

Although the agent for Philips & Co. and Philips, himself, testified that they did not know that the two mortgages to the Mehlhorn firm, as mortgagee, secured a series of notes, and that, for all they knew, there were but two notes, one for each mortgage, these mortgages were of record, and recited that they were for the series of notes heretofore described, by which

record notice Philips & Co. would be bound. The agent of Philips & Co. was not informed by Mehlhorn that his company was not the owner and holder of the notes, or of the fact that the notes had been sold and were outstanding. Mehlhorn promised to deliver the notes to Bugge, the maker, and stated that he was taking a new mortgage from Bugge which would be a junior lien to the mortgage of Philips & Co. for the balance of accounts between Bugge and his company, and that he would deliver all papers to Bugge. The notes were never delivered to Bugge, and it was more than two years before Philips & Co. learned that the notes had not been so delivered.

On July 3, 1928, Bugge and wife executed to the Mehlhorn firm a second mortgage on the same real property to secure the payment of $7,500. This mortgage was recorded on July 26, 1928, and paid off the former second mortgage of $2,000 of September 13, 1926, plus three months' advance interest on the mortgage, on account of its payment in advance of maturity, and by a personal check to Mehlhorn for $59.95. Bugge settled in full his account with that company.

The loan having been consummated by Philips & Co., it procured the execution of their mortgage on the described real estate by the Bugges, and on July 3, 1928, recorded in the office of the county auditor of King county the two satisfactions of mortgages delivered to it by Mehlhorn. On July 5, 1928, at the instance of Philips & Co., a title insurance company issued to them its mortgagee's policy of title insurance directed to Penn Mutual, to which Philips & Co. was expecting to sell the mortgage. On June 11, 1928, Philips & Co. assigned its mortgage to Penn Mutual, which assignment was recorded on June 22.

To close the loan with Bugge, Philips & Co. borrowed

twenty-five thousand dollars from the Bank of California on its own personal note, dated July 3, 1928. It gave as security a collateral assignment of the Bugge note and mortgage. By this arrangement, the bank was secure, and would be the owner of the note and mortgage in the event Penn Mutual failed or refused to complete the purchase.

On July 7, 1928, Philips & Co. forwarded to Penn Mutual, Bugges' note for twenty-five thousand dollars, the recorded mortgage and the recorded assignment thereof, together with policies of title and fire insurance and Bugges' receipt to Philips & Co. showing he had received the twenty-five thousand dollars, as required by Penn Mutual in its letter of February 28. In a letter accompanying these papers, Philips & Co. requested Penn Mutual to forward the amount of the mortgage to the credit of the Bank of California, through the Philadelphia National Bank.

After an inspection of the documents by the Penn Mutual and they were found to be in proper form and order, and it appearing that the mortgage was a first lien upon the property, it purchased the loan, and on July 13, 1928, transmitted to the Bank of California, through the Philadelphia National Bank, the twenty-five thousand dollars to be credited to Philips & Co., and also caused to be so credited $38.24, representing accrued interest on the mortgage from July 3, 1928, the date Philips & Co. closed the transaction with Bugge, to July 13, 1928, the date Penn Mutual purchased it from Philips & Co., the purchase being thus concluded on July 13, at par, plus accrued interest. Upon receiving this money through the Bank of California, Philips & Co. paid the bank its personal note of $25,000, and received back the collateral assignment of July 3.

When Mehlhorn received the $25,000 on July 3, 1928, it credited the amount of each of the note owners with

the principal amount of their respective notes, plus three months' advance interest, and marked the same paid. It paid none of the note owners in cash, except Bloxom, who received his $5,000 and surrendered his notes to Mehlhorn. Mehlhorn continued to pay the other note holders quarterly interest, as stipulated in the old notes, until September 2, 1930, when August Mehlhorn, Jr., disappeared and has not since been heard from. After his disappearance, the note holders advised Bugge that they held his notes. None of them had examined the public record to ascertain the legal status of the mortgage until after his disappearance.

In the last five years, from sixty to eighty per cent, numbering one hundred or one hundred fifty, of the mortgage loans made by Philips & Co., were sold to Penn Mutual. The majority of loans sold to Penn Mutual were approved before the loans were closed. Some years ago, Philips & Co. were obliged to meet competition by making loans without commission from the borrower. The loan would then be made at one-half per cent higher, the borrower to be charged six per cent, but no commission. One-half per cent would be retained by Philips & Co. as it collected the interest. The Bugge loan was not of that type. All the commission and expenses on this loan were paid by Bugge.

The situations of all of the respondents in their relations with the Mehlhorn firm were very similar, with the exception of respondent Koppler. Koppler had never before had any transactions with the Mehlhorn firm, and his purchase of the Bugge notes was his first purchase of any security from Mehlhorn. He positively refused to authorize Mehlhorn to collect any part of the principal of his notes. Because there were so many notes, as stated to him by Mehlhorn, and the interest was payable so frequently, he permitted Mehlhorn to collect and remit the interest on his notes.

Other specific evidence will be related in discussing certain particular issues.

Judgment was entered by the court in accordance with its memorandum decision against Bugge and wife upon the old notes, the old mortgage was ordered foreclosed, the purported satisfaction of it ordered cancelled, and the Penn Mutual mortgage adjudged to be junior and inferior to the old mortgage securing respondents' notes. From that judgment, appellants Bugge and Penn Mutual have separately appealed.

The case is here to be tried *de novo,* upon the record.

It is obvious that everybody connected with this transaction, with the exception of August Mehlhorn, Jr., acted in the utmost good faith. The great difficulty is to ascertain upon whom of all these parties must the greater burden of loss be visited.

 Both appellants contend that the old notes are non-negotiable because of that clause of the note heretofore quoted, and cite and quote as sustaining their contentions, Rem. Comp. Stat., §§ 3392 to 3396; *Bright v. Offield,* 81 Wash. 442, 143 Pac. 159, and *Puget Sound State Bank v. Washington Paving Co.,* 94 Wash. 504, 162 Pac. 870; *Coolidge & McClaine v. Saltmarsh,* 96 Wash. 541, 165 Pac. 508; *Vancouver National Bank v. Starr,* 123 Wash. 58, 211 Pac. 746, following the *Bright* case.

The clause in the notes in suit is the reverse of the clause in the *Bright* and other cases, *supra,* in that, in the *Bright* case, the provision rendering the note non-negotiable was:

"If the maker . . . shall allow the taxes or any other public rates and assessments on the mortgaged property, . . . to became delinquent . . . or in case any taxes or assessments shall be levied against the holder of this note, . . . the whole amount herein secured shall at once become due and payable,

and the mortgagee, its legal representatives or assigns, may proceed at once to collect these notes and foreclose the mortgage. . . . ''

The provision of that note was operative before maturity and the note was otherwise negotiable, while here the provision in the notes is not operative before maturity, and does not come into effect until the notes have already become non-negotiable by having matured. Under the general rule of law, as stated in 3 R. C. L. 916, the instruments in question here were negotiable instruments. See, also, *Second National Bank v. Anglin,* 6 Wash. 403, 33 Pac. 1056.

We therefore affirm the holding of the trial court that the twenty old notes were negotiable instruments, and respondents were all bona fide purchasers for value in due course, and therefore *pro tanto* owners and holders of the mortgage securing them.

■ ■ We also concur with the conclusions of the trial judge numbered two, three and four in his memorandum.

The discussions of the matters involved in those conclusions have taken such a wide range that it is impossible to discuss them, and the many decisions cited, extensively, in this opinion.

Suffice it to say that agency is a matter, not to be presumed, but to be proven, and the burden of proving it must be borne by the party who asserts it. 31 Cyc. 1643; *Bernstein v. Schwartz,* 108 Wash. 271, 183 Pac. 105. It is, of course, true, as we have many times held, that agency is often implied by the course of dealing or conduct between parties, so as to bind one or the other party to a transaction, as in *Delaney v. Nelson,* 132 Wash. 472, 232 Pac. 292, and the cases there cited; and sometimes established by ostensible agency, or estoppel, as in *Easton v. Littooy,* 91 Wash. 648, 158

Pac. 531, *First National Bank of Seattle v. Hessell*, 133 Wash. 643, 234 Pac. 662, and other like cases.

Respondents in this case had the old notes in their possession which Mehlhorn had assigned and delivered to them. They were negotiable instruments, outstanding and unpaid, of which appellants Bugge had absolute knowledge. This knowledge must be imputed as notice to his agent by appointment, Philips & Co., who never caused to be paid, satisfied, surrendered and delivered the old notes.

Respondents, therefore, are within the rule followed in *Kucher v. Scott*, 96 Wash. 317, 165 Pac. 82, and cases there cited; *Western Security Co. v. Douglass*, 14 Wash. 215, 44 Pac. 257, and *Burtt v. Schoening*, 138 Wash. 187, 244 Pac. 381, and cases there cited. These cases sustain the above mentioned conclusions of the trial court, and not cases cited by appellants, of which *Erickson v. Kendall*, 112 Wash. 26, 191 Pac. 842, and the *Hessell* case, *supra*, are fairly typical.

Appellants Bugge place great reliance in our most recent case involving this same question, and involving also securities sold by Mehlhorn in a similar manner to the transactions involved here; *Pfeiffer v. Heyes*, 166 Wash. 125, 6 P. (2d) 612. In that case, tried as a law action, the lower court found, and we affirmed it upon sufficient evidentiary support, that Mehlhorn was the general agent for investments of Heyes and his community for about fourteen years. One principal payment had been paid and accepted through Mehlhorn, in that transaction. Mehlhorn had frequently invested money for Heyes, attended entirely to the collection of fire insurance on the building involved after a fire; repeatedly had Heyes' money on hand for investment; and had granted many renewals which were ratified by Heyes. Those facts distinguish that case from the case at bar.

█ We must agree with the trial court that Philips & Co. was the agent of appellants Bugge in paying the money to Mehlhorn, which paid it on the debts secured by the old mortgage. Without implying any odium to it, it was negligence on the part of Philips & Co. not to take up all the old paper outstanding under the old mortgage. Philips & Co. and Calvin Philips, personally, and its loan agent, undoubtedly relied upon a practice, which had originated about 1927, to take such receipts, as was taken, guaranteeing delivery of all paper, and also relied upon the reputation for probity and integrity of Mehlhorn himself and the financial responsibility of his company to make the guaranty of sufficient worth to insure the return of the old notes. However, Philips & Co. permitted the old notes to remain outstanding for more than two years, until the disappearance of Mehlhorn, without diligently attempting to secure their delivery and cancellation. The guaranty was to deliver all the old paper to Bugge. Bugge had made Philips & Co. his agent. Philips & Co. permitted Mehlhorn to defraud Bugge by its long delay in taking the steps which would have prevented it.

It is therefore apparent that the loss by Mehlhorn's fraud was occasioned by the remissness of appellants Bugge and the delinquency of their agents. The liability therefor must fall upon appellants Bugge. *Kucher v. Scott, supra.*

█ By all the same principles of law above determined, that agency must be proven, and not presumed, and proven by the party asserting it, we can see no evidence whatever of any commitment of agency, by appointment, or by any course of conduct, or estoppel, on the part of Penn Mutual of any agency for it by Philips & Co. We do not interpret the letter of Feb-

ruary 28, 1928, from the manager of Penn Mutual to Philips & Co. as counsel for respondents and the trial court construe it. They interpret the advice contained in that letter, requiring a receipt signed by the borrower acknowledging receipt of the funds, as somehow applying only to an agent of Penn Mutual, when it certainly can apply just as well to a vendor. In the same paragraph of the letter, Penn Mutual said it had been made a requirement that they hold with every loan *purchased* a receipt signed by the borrower acknowledging receipt, and that such receipt would be required in connection with all loans which Philips & Co. expected ultimately to *sell* to Penn Mutual.

The trial judge seemed to consider that there was some subterfuge about the relations between Penn Mutual and Philips & Co., and that they at all times were "meticulous" to keep the *form* as that of vendor and vendee, when the circumstances show that, in *substance,* there was at least a "limited agency" on the part of Philips & Co. to represent Penn Mutual in certain particulars in connection with the release of outstanding obligations and in the recording of assignments.

Those certainly were details that, as a matter of convenience, from a seller to his purchaser, of a sale of a mortgage security, would be attended to by the seller, in advance, in order to satisfy the buyer of the security and save delay to the seller. We can see nothing in that to indicate even limited agency.

Philips, himself, testified as a witness for respondents, and his testimony was in no wise contradicted. Respondent Koppler quotes part of his testimony as follows:

"When we take an application for a loan we examine the security. If it is a loan we are going to try to sell to the Penn Mutual we send them a copy of the

application with our report of the survey. If Mr. Holt, the company's salaried inspector, has not at that time examined the security, the company will, if it approves it, approve it subject to inspection. If Mr. Holt has examined it the 'Subject to inspection' requirement is not included in the approval, *but all loans are approved subject to all things being found satisfactory, which means that we proceed with the preparation of the papers,* having them signed and put of record, and the loan completely closed, and when the papers reach Philadelphia if they are found in order and all requirements regarding the property are found correct, the loan is then settled for. That is the procedure. That answers your question.''

Respondents stressed particularly the above italicized portion. This was not all that Philips testified to without contradiction. Excerpts from the record, summarized from the testimony of Philips, are that the form of application used for the Bugge loan is a universal form that Philips & Co. use; that Philips & Co. put their own money into the entire loan before the Penn Mutual put one dollar into it. Penn Mutual didn't put a dollar into it until all of the papers had reached Philadelphia, they had examined it, completed the purchase and remitted the money; Philips & Co. have no further interest in a mortgage after it has been sold to Penn Mutual; they give the same receipt for all parties making payments upon a note and mortgage, not specifying that Philips & Co. is agent for anyone, pursuing the custom followed by it in all loans handled by it, it having no written instructions from anyone whereby it may take in principal and interest from the borrower. Philips & Co. does not handle the money of borrowers in any different way than is done for any other of its clients.

Philips also testified that borrowers were frequently in need of the money very soon, which was the reason

why such receipts were taken as was received from Mehlhorn in connection with the Bugge loan, and that, in a number of such instances, his company had closed the loans before it had received the approval of Penn Mutual or any other of its clients. He expected the Bugge loan to be sold to the Penn Mutual, and that was why he sent the application to that company. His company, in all such cases, was anxious to sell the loan as quickly as it could, so it was submitted either to Penn Mutual, or to any one of the twenty-five or thirty or fifty other clients immediately.

Philips & Co. sell loans to twenty-five or thirty or more clients, and make loans with the intention of reselling them. It has not capital enough to take on a large volume of business, but can take on a limited number of loans and carry them until they have been sold. Just as quick as it gets an application, Philips & Co. proceeds to find a customer as soon as it can. Philips & Co. collects from the borrower in the form of a commission. Penn Mutual never paid a dollar to Philips & Co. for any collections made by it nor for anything else. They never paid anything for office expense. Philips & Co. have been Penn Mutual's correspondents for twenty-five or thirty years. They buy no mortgages from anyone else in the vicinity of Seattle.

All that testimony related to *sales* by Philips & Co. to Penn Mutual, and a denial of the relation of principal and agent.

We can see nothing in this testimony, introduced by respondents themselves, which in any way indicates that there was only a ''seeming'' status of vendor and vendee, and that there was anything feigned and sinister in the relations between Penn Mutual and Philips & Co. They dealt with each other wholly at arm's length. Penn Mutual had an undoubted right to put

out no money from its trust funds, except upon approved security, such as would be approved by reliable and trusted sellers of mortgages and in whom it had confidence, as apparently it had in Philips & Co., exclusively, in Seattle.

Philips & Co., as the agent of appellants Bugge, was chargeable with the knowledge which it had, or by reasonable inquiry could have had, respecting the old outstanding notes. But that was an agency exclusively for appellants Bugge. It imputed nothing to Penn Mutual. The case of Penn Mutual therefore falls within another rule announced in *Kucher v. Scott, supra,* that there was no act of Penn Mutual which placed it in the power of appellants Bugge or their agent, Philips & Co., to cause the loss. See, also, *Bjorkstam v. Federal Land Bank,* 138 Wash. 456, 244 Pac. 981; *DeKay v. Hackensack Water Co.,* 38 N. J. Eq. 158; *Henry v. Allen,* 151 N. Y. 1, 45 N. E. 353, 36 L. R. A. 658.

Appellant Penn Mutual, not being a principal of Philips & Co. and Philips & Co. not being its agent, is entitled to the protection of chapter 278, Laws of 1927, p. 670 (Rem. 1927 Sup., § 10596 *et seq.*), defining mortgages on real estate as real property and assignments thereof as conveyances of real property; requiring deeds, mortgages, and assignments of mortgages, to be recorded in the office of the county auditor of the county where the land is situated, and providing that, when they are so filed, they shall be notice to all the world, from the date of recording, recently applied and its effect decided in *Price v. Northern Bond & Mortgage Co.,* 161 Wash. 690, 297 Pac. 786.

We conclude that the trial court erred in holding that the old debt and mortgage lien is superior to the lien of Penn Mutual's mortgage. This result affects

only the security of respondents, which is subordinated to that of Penn Mutual.

The decree of the trial court is reversed upon the appeal of Penn Mutual Life Insurance Company, and affirmed in all other respects.

Appellant Penn Mutual Life Insurance Company will recover its costs on appeal and in the trial court against respondents. Respondents shall have their costs on appeal and in the trial court against appellants Bugge and wife.

Remanded, with directions to enter judgment in accordance herewith.

TOLMAN, C. J., MAIN, BEALS, and MILLARD, JJ., concur.

